**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

PAUL KOVACIK,

          Defendant.

Crim. Action No. 24-cr-342 (RBW)

## MR. KOVACIK'S MEMORANDUM IN AID OF SENTENCING

*I have always found that mercy bears richer*

*fruits than strict justice.*

*Abraham Lincoln*

Paul Kovacik will be before the Court for sentencing (and resentencing in Case No. 22-cr-239) on December 9, 2024, having accepted full responsibility for his conduct at the U.S. Capitol on January 6 and his subsequent failure to surrender to serve his sentence.  Mr. Kovacik is, at his core, a vulnerable and mentally troubled man.  Although he has never been formally diagnosed with a cognitive condition, it only takes a few minutes of observation to deduce his intellectual and social short comings.  Due to his history and characteristics and given that he has already served double the sentence imposed, he asks this Court to reimpose the 90 days of imprisonment in the 22-CR-239 matter and sentence him concurrently to time served and 12 months of supervised released in the 24-CR-342 matter.

I.    **The sentencing factors support the requested sentence.**

U.S.C. § 3553(a) directs the Court to impose a sentence that is "sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing.  The relevant sentencing factors are discussed below.

**a. Mr. Kovacik's history and characteristics support the requested sentence.**

Paul started off already different from other children when he was diagnosed with Perthes disease, also known as Legg-Calve-Perthes, before he turned five years old. Due to his condition, Paul had to wear leg braces, which his cousin Eric likened to the braces in the movie Forrest Gump.  Counsel found this description particularly apt, given that Mr. Kovacik presents as even less capable than the character Forrest Gump.  Paul's physical disability isolated Paul from other children by marking him as different and as a result, Paul was a socially introverted child who kept to himself.

2

When he was approximately eight years old, Paul was put in Special Education for his learning disabilities. Special Education was horrible for Paul and further contributed to his loneliness. Paul describes the experience as a "segregated study hall" and he longed to be able to be in normal classes with other people. Being physically separated from the rest of his peers made it even more difficult for Paul to make social connections, and he had no friends in school. School was not a good place for Paul, who struggled tremendously both socially and academically. Paul was always the last to be chosen for sport teams and often bullied. Paul stayed in Special Education, barely passing his classes, until he graduated in 1985.

Paul's younger sister, Corrine, was also in Special Education at school. Although nobody remembers her exact diagnoses, Corrine never developed mentally once she reached adulthood and comes across like she is seven or eight years old. When Corrine became an adult, their mother struggled to take care of Corrine. Paul remembers his mother was so focused on protecting and supporting Corrine that she forgot to mother him. Corrine was put into a residential home for her disabilities in the eighties. To this day, Corrine resides in Brotoloc, a residential home for people with developmental disabilities.

Paul describes his childhood with his parents as tense, recalling a lot of verbal and emotional abuse. Eric, when asked about his aunt (Paul's mother), described her as extremely cold and unloving. Eric believes that this caused Paul to have deep issues trusting people and having relationships. *See* Exhibit A, Eric Timm's Letter of Support.

3

Paul's father's parents moved to Milwaukee from Czechoslovakia and were first-generation immigrants who did not speak much English. Most of the paternal family changed their last names from Kovacik to remove their origin association. Although Paul's paternal side of the family lived close by, they were not in Paul's life.

Eric would visit Paul's family about three times a year growing up. Eric remembers how poor Paul's family was in comparison to his own, and commented that Paul's family lived "near the projects." Robert, Paul's father, was in the military, and Paul's mother Marilyn worked various part-time jobs as a clerical assistant. Paul's family started to do better financially when they moved at Grafton, WI in approximately 1974, and Paul's father Robert got a job at the Cedarburg Post Office as a mailman. However, when Paul was fifteen, his father Robert died of a heart attack. Robert's death was a turning point for his family, disrupting the financial progress that his family had made.

Paul was extremely emotionally affected by his father's death. Eric remembers coming to Paul's house after Robert died and gathering with the whole family. Nobody in the family could find Paul, who disappeared for a long time before his dad's funeral. Paul did show up to the funeral, but he sat alone and separate from the rest of his family. Paul describes this time as the beginning of his depression. Although Paul has always struggled socially, Eric remembers his isolation escalating after his dad passed away. Now, Paul heavily identifies with autism, which wasn't an available diagnoses during his childhood.

Paul enrolled in The University of Wisconsin-Stout a year after he graduated from high school. However, there, he continued to struggle with school. Nobody in his family had gone to college, so Paul didn't have anyone to lean on for support through college. Paul wasn't sure if his dad had ever graduated from high school. Paul's depression worsened and he dropped out after a semester.

As an adult, Paul lacked the necessary stability that he needed in terms of housing and finances. Paul lived with his mother after graduating high school but would move to different cities every couple of years for different jobs. Paul periodically returned to living with his mother in Grafton.

Paul has never been able to keep steady employment, which has caused him financial difficulty. The longest job he ever had was as an usher/ticket taker at Sims in Minneapolis in the early nineties for about two years. Paul worked at the Ames Tribune delivering newspapers in about 1992. Paul then moved to Iowa City and had difficulty securing employment. In approximately 1996, Paul moved to St. Paul, MN and worked at the Valley Fair Amusement Park and then at the Cedar Point Amusement Park in Ohio. Before his arrest in DC, Paul had last worked at an amusement park. Most of the jobs he had ended because Paul was not good at interacting with customers and smiling. Paul's unemployment meant that he was often moving around every couple of years, adding to the instability in his life.

Paul's depression also contributed to his restlessness. When Paul was feeling particularly low, Paul would usually move, hoping the change of circumstances would improve his mental health. Paul continued using escapism as a defense mechanism

when he was struggling. Paul never received mental health services to address his depression. During this time, Paul was taken by the police to a psychiatric ward on more than one occasion for suicidal ideation, but Paul never received the continuous mental health care he needed.

In 2009, Paul's mother was taken to a nursing home and passed away shortly after.  Paul stayed living in the house that he and his mom were living in until he was evicted.  A local social services organization that works with people with disabilities, the Center of Independence in Milwaukee, got involved and set Paul up with a room in a house in a different part of town.  The Social Security Administration deemed Paul disabled and not able to properly handle his finances.  The Center of Independence gave Paul a payee to handle his finances.  In 2012, Paul switched organizations.  Since then, Paul has had a Case Manager named Amanda with the Equality Payee Services of Wisconsin, which helps people with disabilities manage their finances.

Paul also has extreme difficulty maintaining relationships. After his mom passed away, the only person there for Paul was his cousin Eric.  Paul has **never** had friendships or romantic relationships in his life.  Eric thinks that his unusual social behavior explains why he has had difficulty.  Eric recalls a time when Paul came to stay with him at his house, just for one night.  Eric gave Paul the guest bedroom with a bed to stay in.  However, Paul brought his own sleeping bag and insisted on sleeping on top of the bed.  Eric thought that Paul wasn't used to sleeping in a bed.  Paul

6

occasionally called Eric for help with money or if his car broke down over the past 30 years. Every time Eric helped Paul out, Paul would stop by to say thanks.

Paul describes himself as addicted to the internet. Although Paul doesn't have any friendships in his life, the internet has always been a friend to him. Paul began to go to the public libraries to use the computer for hours a day. Paul would spend this time browsing on various news and social media sites. Paul also occasionally went to college libraries to use the computers, which got him into trouble a couple of times since he wasn't authorized to be there.

Paul's first arrest was a speeding ticket. Paul continued to get minor traffic violations until his license was taken away by the court. Due to Paul's financial difficulties, he was never able to pay the fines to get his license reinstated. However, Paul was living in cities with poor public transit systems, and still relied on his car to get to jobs, the grocery store, library, and nowhere else he had to go. This resulted in Paul getting arrested numerous times for driving on a suspended license.

Paul hated being in jail. When asked to describe jail, Paul said that "you are all alone, without anybody else around you." Paul compared the experience to Special Education classes in school. Paul began to dread being arrested. In 2004, Paul had a police officer come up behind him and motion for him to pull over. Paul saw the officer and kept driving, freezing in the moment. The officer followed Paul to his home, where he arrested Paul. This Eluding charge, which Paul pled to, is Paul's only felony conviction.

Paul has been making plans for the future.  He sees himself thriving in a group home like his sister's.  Paul wants to finally access the mental health care he needs.  Since he has been in the Central Detention Facility in D.C., Paul has been receiving mental health care for his anxiety and depression.  In addition to seeing a clinician regularly, Paul is also taking Bupropion HCL and Escitalopram (brand name known as Lexapro), which are both medications to address his mental health.  Paul has found that these medications have helped how he is feeling, and he plans to continue prioritizing mental health care after he is in the community.

## B. The nature and circumstances of the offense support the requested sentence.

In addition to the consideration of his history and characteristics, this Court should also consider that Mr. Kovacik's conscience and values were overcome by the larger group's emotions.  Mr. Kovacik has always longed for community, seeking it out on the internet.  The same happened here when Mr. Kovacik joined the crowd at the Capitol.  The mob mentality that influenced the crowd on January 6, 2021, does not excuse his actions, but the concept of groupthink and the research discussed should be considered as part of the circumstances of the offense under 18 U.S.C. § 3553(a).

Mr. Kovacik's actions on January 6 were the result of his choices.  However, his "choices" can be directly linked to the idea of "groupthink."  In 1970, psychologist Irving Janis coined the phrase "groupthink" to describe "a process in which a group can make bad or irrational decisions as each member of the group attempts to conform

their opinions to what they believe to be the consensus of the group."[1]  Groupthink often occurs when people are deeply involved in a group, sharing a strong feeling of solidarity and determined to maintain the group relationships, no matter the costs. Group members often behave at a maturity level well below what they ordinarily would.  "A man descends several rungs in the ladder of civilization . . . by the mere fact he forms part of an organized crowd. Isolated, he may be a cultivated individual: in a crowd, he is a barbarian - this is, a creature acting by instinct."[2]  Regarding group behaviors, neurologist Sigmund Freud argued that people in groups exhibit a loss of individuality, focus their thoughts and feelings into the common direction, are overcome by the unconscious power of emotion rather than reason and judgment, and are compelled to immediately carry out their intentions and the intentions of the group.[3]

Group violence happens because individuals, whose conscience and values are overcome by the group's emotions, now look to the group leader as their moral compass.[4]  Before the events of January 6, 2021, former President Donald Trump encouraged Americans to travel to Washington D.C. and attend the "Stop the Steal" rally.  At this rally, claims that the 2020 Presidential election was stolen were repeated and action was encouraged.  Representative Madison Cawthorn announced,

---

[1] Robert Bejesky, The SSCI Investigation of the Iraq War: Part i: A Split Decision, 40 S.U. L. Rev. 1, 28 (2012).

[2] Gustave Le Bon, *The Crowd: A Study of the Popular Mind* 12. (Norman S. Berg ed., 1968)

[3] Ravi Bhavanani, Ethnic Norms and Inter ethnic Violence: Accounting for Mass Participation in the Rwanda Genocide, 43 J. PEACE RES. 6, 653 (2006).

[4] Steve K. Baum, *The Psychology of Genocide: Perpetrators, Bystanders, and Rescuers*, Cambridge Univ. Press, 9, 199 (2008)

"This crowd has some fight in it. ... The Republicans hiding and not fighting, they are trying to silence your voice."[5]  Former President Trump addressed the crowd, saying

> And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore . . .. So, we're going to, we're going to walk down Pennsylvania Avenue . . .. And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country . . .. So, let's walk down Pennsylvania Ave.[6]

Social scientists have long observed how individuals in crowds of like-minded people can act in ways they never would individually because the *crowd* lost control.[7]  Often, their conduct cannot be connected to duress, mental illness, emotional upset, or any other mitigating conditions commonly recognized under criminal law; however, many crowd members have "fully internalized the beliefs and values" of the group leaders, influencing their conduct.[8]  With leadership members encouraging people to fight on January 6, mob frenzy took over.

"One of the main factors of the groupthink theory consists of an 'illusion of invulnerability . . . [leading people to] ignore obvious danger, take extreme risk, and

---

[5] Joseph Choi, *Former sheriff regrets supporting Madison Cawthorn after he 'inflamed' Capitol mob*, The Hill, Jan. 12, 2021

[6] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot.

[7] Associated Press, *Rioters blame 'mob mentality' for violence at the Capitol*, American Journal News, May 24, 2021, https://americanjournalnews.com/january-6-capitol-rioters-mob-mentality-defense/.

[8] Paul H. Robinson & Lindsay Holcomb, *Indoctrination & Social Influence as a Defense to Crime: Are We Responsible for Who We Are?*, Penn Carey Law: Legal Scholarship Repository (2021), https://scholarship.law.upenn.edu/faculty_scholarship/2153?utm_source=scholarship.law.upenn.edu%2Ffaculty_scholarship%2F2153&utm_medium=PDF&utm_campaign=PDFCoverPages.

10

[be] overly optimistic.'"[9]  Brian Levin, the director of the Center for the Study of Hate & Extremism at California State University, has found that anyone who is part of the group, no matter how weak their connection, can turn violent because the responsibility seems to spread among the group and a "cloak of anonymity" covers the whole.[10]

Research on the mob mentality of sporting fans supports the ideas that a cultivated individual can become so entrenched in the group's goals that he no longer makes the same decisions he would on his own.  The mere existence of a crowd can empower the individual spectator and delocalize one's decision making.  When the sports fan's emotions become charged, the atmosphere becomes volatile; dangerous riots happen, and the actions of the fans can quickly shift from impolite to illegal. Psychologists that have researched violent soccer fans believe, "violence and die-hard loyalty stems from positive emotions like passionate commitment to the group and the desire to belong."[11]

---

[9] Kelley Tiffany, *Cheering Speech at State University Athletic Events: How Do You Regulate Bad Spectator Sportsmanship?*, 14 Sports Law. J. 111, 136 (2007) (quoting I.L. Janis & L. Mann, Decision Making: A Psychological Analysis of Conflict, Choice, and Commitment (1997)).

[10] Rachel Wiener et al., *Desperate, angry, destructive: How Americans morphed into a mob*, The Washington Post, Nov. 9, 2021, at 8:00 a.m., https://www.washingtonpost.com/dc-md-va/2021/11/09/rioters-charges-arrests-jan-6-insurrection/.

[11] Margi Murphy, *Soccer fans have the same mentality as terrorists, study claims*, New York Post, Sept. 27, 2017, at 10:47 a.m., https://nypost.com/2017/09/27/soccer-fans-have-the-same-mentality-as-terrorists-study-claims/; *see* Martha Newsom, *Football, fan violence, and identity fusion*, 54 Int'l Rev. for the Socio. of Sports 431 (2019); *see also* Shirley Wang, *Sports Complex: The Science Behind Fanatic Behavior*, Ass'n for Psych. Sci., May 1, 2006, https://www.psychologicalscience.org/observer/sports-complex-the-science-behind-fanatic-behavior.

Police in Britain have had success stopping violence and rioting that often erupts during actual sporting events, identifying and removing key instigators at soccer games.  However, as Fiona Hill, who served on the National Security Council in the Trump administration, noted, "It's hard when the person who was inciting it happens to be the sitting president of the United States . . . makes it a bit difficult for the police to extricate him."[12]

Under 18 U.S.C. § 3553, the court must consider the circumstances of the offen*se*.  As discussed, research recognizes how an individual loses oneself in the crowd and often looks to the group leader for guidance.  Groupthink can take over and violence easily ensue, as happened on January 6, 2021.  In the Reginald Denny case of 1992, defendants were acquitted of their most serious charges after a psychiatrist explained how mob mentality took control, causing them to lose their normal control and resort to violence.  Mob mentality was not used by their attorneys to excuse their actions.  Rather, they urged the jury to consider that they were "caught up in the mob frenzy" when assigning their guilt.  Similarly, the mob mentality that influenced the crowd on January 6, 2021, does not excuse their actions, but the concept of groupthink and the research discussed should be considered during sentencing, particularly given that Mr. Kovacik did not engage in any violence or destruction on January 6.

---

[12] Rachel Wiener et al., *Desperate, angry, destructive: How Americans morphed into a mob*, The Washington Post, Nov. 9, 2021, at 8:00 a.m., https://www.washingtonpost.com/dc-md-va/2021/11/09/rioters-charges-arrests-jan-6-insurrection/.

While the above argument speaks to the nature and circumstances of his conduct on January 6, his particular history and characteristics in the proceeding section explain the nature and circumstances of his failure to surrender. He is a pathetic man who was scared, so he fled. It was not a smart or thoughtful decision as he is not a smart or thoughtful man. But he has now served double the sentence the Court imposed upon him, and further incarceration is not necessary to achieve the goals of sentencing.

## C. A sentence below what the government is seeking would avoid unwarranted disparities.

Given that the government and defense are essentially in agreement in regard to the amount of custodial time in the resentencing under *Little*, counsel does not see a need to address the January 6 conduct through a case-by-case analysis. However, the sentence the government seeks in the failure to surrender matter is the max amount of imprisonment allowed under the law and would indeed create an unwarranted sentencing disparity. According to the Judiciary Sentencing Information (JSIN) provided on the last page of the PSR, the average length of imprisonment for this offense is 6 months of incarceration. If the Court granted the defense's request for time served to run concurrently with the 22-CR-239 case, Mr. Kovacik would have served 6 months, and be right on track with the average for other people convicted of the same crime.

**D. The requested sentence will achieve the goals of sentencing.**

Mr. Kovacik is terribly remorseful.  Mr. Kovacik knows that his actions brought this cascade of consequences onto himself.  However, more prison exceeds what is needed to achieve the goals of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
ALEXIS GARDNER
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004

14